

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS, EX REL DR. KELLY BALTAZAR, ) ) ) ) | |
| Plaintiffs, ) ) | No. 07 C 4107 |
| v. ) ) | Honorable Charles R. Norgle |
| LILLIAN S. WARDEN, an individual, and ADVANCED HEALTHCARE ASSOCIATES an Illinois Corporation, ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Plaintiff Dr. Kelly Baltazar ("Plaintiff") is a former employee of Advanced Healthcare Associates ("Advanced Healthcare"). She brought this *qui tam* action on behalf of the United States and the State of Illinois against Advanced Healthcare and its proprietor, Lillian S. Warden ("Warden") (collectively, "Defendants"), pursuant to the False Claims Act ("FCA") and the Illinois Insurance Claims Fraud Prevention Act ("ICFPA"). Both the United States and the State of Illinois declined to intervene in her case. In support of her FCA claim, Plaintiff alleged generally that Defendants improperly billed Medicare for chiropractic services that Defendants did not provide or that Defendants' patients did not need. In response, Defendants chose not to dispute the veracity of Plaintiffs' allegations. Instead, they attack the complaint on jurisdictional grounds, arguing that the complaint fails as a matter of law because the public disclosure bar set forth in § 3730(e)(4)(A) of the FCA precludes the Plaintiff from proceeding in this Court.

Before the Court is Defendants' motion for summary judgment. For the following reasons, the motion is granted with respect to Count I. The Court shall relinquish jurisdiction over Count II, Plaintiff's state-law claim for a violation of the ICFPA. United States ex rel. Houck v. Folding Carton Admin. Comm., 881 F.2d 494, 505 (7th Cir. 1989) (affirming court's decision to relinquish jurisdiction over pendent state-law claims where the federal court lacked jurisdiction over plaintiff's proposed federal claims).

## I. BACKGROUND

Defendants employed Plaintiff as a chiropractic physician from February 5, 2007 until June 8, 2007. The job involved treating patients, completing physician chart notes and filling out billing sheets and fee slips with treatment codes that corresponded to the services that Plaintiff provided to her patients. At some point Plaintiff discovered that her supervisor, Warden, was altering Plaintiff's billing sheets so that they reflected services or treatments of which Plaintiff was unaware. In doing so, Warden either physically altered Plaintiff's chart notes, or marked a different service code on Plaintiff's fee slips that reflected a more expensive procedure than the one Plaintiff actually provided. This latter practice is commonly referred to as "upcoding." After making her changes, Warden allegedly submitted the altered billing statements to Medicaid, Medicare and private insurance carriers, which, in turn, reimbursed Advanced Healthcare for the overstated amount of money. Put simply, Advanced Healthcare charged the government for services that its physicians did not provide. But the alleged scam did not end there.

After only four months on the job, Plaintiff alleges that she uncovered through internal sleuthing a series of activities through which Advanced Healthcare sullied the chiropractic profession and inflated its bills to Medicare. For instance, she alleges that Defendants: provided

patients with unnecessary treatment; upcoded their bills to reflect therapeutic exercises that physicians did not perform; upcoded their bills to reflect chiropractic manipulation, the most common service that Medicare covers; upcoded their bills to reflect electric stimulation that physicians did not provide; submitted bills for re-examination when, in fact, re-examination was not performed; predated doctor's notes to reflect that a medical exam took place prior to chiropractic treatment, although it had not; delayed the submission of bills; and routinely waived the collection of its patients' deductibles. After learning of these activities, Plaintiff says that she was no longer willing to work for the company. She immediately tendered her resignation and filed this lawsuit, alleging that Defendants' billing practices violated the FCA, 31 U.S.C. § 3729 et. seq., which prohibits the presentation of a "fraudulent claim for payment or approval" to the United States Government. 31 U.S.C. § 3729(a)(1).

Plaintiff in this case is a "relator," acting on behalf of the United States. In FCA cases, this designation essentially means that Plaintiff discovered a fraud on the government and, by stepping into the government's shoes, seeks vindication through a civil action that pays out three times the amount of damages that the government sustained. See Mathews v. Bank of Farmington, 166 F.3d 853, 857 (7th Cir. 1999). Relators serve, in some way, as private attorney generals. Id. at 858. In most cases they are in the best position to defend society's best interests, and thus Congress built into the FCA a *qui tam* provision that provides a hefty monetary award for individuals who come forward, identify a fraud on the government, present the fraud to the appropriate authorities and, thereafter, proceed with a private action if the authorities decline to prosecute. See Feingold v. Adminastar Federal, Inc., 324 F.3d 492, 495 (7th Cir. 2003); Mathews, 166 F.3d at 858 ("Congress wanted to reward private individuals who take significant personal risks to bring wrongdoing to light…and to encourage whistleblowing and disclosure of

3

fraud."). At its core, the FCA's *qui tam* provision authorized private individuals, like Plaintiff, to sue on behalf of the federal government, thereby aiding the government in discovering fraud and abuse. Bannon v. Edgewater Med. Ctr., 406 F. Supp. 2d 907, 914 (N.D. Ill. 2005).

Notwithstanding Congress' intent to increase incentives for the exposure of fraud, the authority it granted to private citizens to sue on behalf of the government was not unyielding. Kennedy v. Aventis Pharm., Inc., 512 F. Supp. 2d 1158, 1165 (N.D. Ill. 2007). In 1986 Congress implemented a number of amendments to the FCA, which, by some accounts, represented "the latest chapter in a long line of repeated congressional efforts to encourage whistle-blowing while simultaneously discouraging 'opportunistic behavior,' [] – that is, to prevent suits based upon public information that the relator played no part in uncovering." Bannon, 406 F. Supp. 2d at 916 (citing United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 651 (D.C. Cir. 1994) (explaining that Congress sought to achieve "the golden mean between adequate incentives for whistleblowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own.")); Feingold, 324 F.3d at 494; United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1016 (7th Cir. 1999). To ease the tension between encouraging people to come forward with valid claims and preventing parasitic lawsuits, Congress established the public disclosure bar to certain *qui tam* actions. The amended Act said:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

35 U.S.C. § 3730(e)(4)(A).

4

Invoking this provision, the Defendants assert that Plaintiff's allegations were publicly disclosed several times in various mediums prior to the filing of this lawsuit, and since Plaintiff was not the original source of the information, that her claims are barred pursuant to § 3730(e)(4)(A). In support of this contention, Defendants attached to their motion for summary judgment no less than 16 reports and articles that purport to form the basis for Plaintiff's claims against them. This, according to Defendants, bars the Plaintiff from bringing this *qui tam* action. Given their significance, the Court shall discuss each of these reports and articles in turn.

The first item attached to Defendants' motion for summary judgment is a July 1987 briefing report from the United States General Accounting Office ("USAO") entitled, "Health Care Fraud: Characteristics, Sanctions, and Prevention." See Def.'s Mot. for S.J., Ex. 4. The report is an objective, wide-ranging investigation of the most common types of alleged fraud against the government. The report does not focus specifically on fraud committed by medical practitioners such as chiropractors, though it does mention that 89 percent of frauds on the government involve the submission of false claims, of which 85 percent involved health care providers, of which 18 percent were medical practitioners such as chiropractors, dentists and others. From there the report guides the reader through a wealth of facts and figures on the programs affected by fraud and on those schemes referred to the United States Department of Justice during the report's relevant time period. It continues by discussing the actions taken by the government to curb the various frauds, and by outlining the civil penalties and fines available as sanctions against those found guilty of fraud. Finally, in the appendix is a remark that the typical cases concerning false claims "involved questionable charges such as billing the Medicare and/or the Medicaid program for (1) services not rendered at all, (2) a more expensive type of service than was actually provided, or (3) services that were provided but not needed."

5

Id., App. I at 11. The report also mentions in the appendix that the largest reported fine imposed by the Office of Inspector General ("OIG") was $1.8 million to a chiropractor that submitted over 2,700 false claims and collected $25,000 in overpayments. Id. at 20.

The second report, dated September 2000, also comes from the USAO and is titled, "Medicare Improper Payments: While Enhancements Hold Promise for Measuring Potential Fraud and Abuse, Challenges Remain." Def.'s Mot. for S.J., Ex. 5. In it the USAO admits that Medicare is a "high-risk program," susceptible to fraud and abuse because of its size, rapid growth and administrative structure. Id. at 5, 10. The report outlines the problems with the system that contribute to improper payments and describes the efforts that the USAO is making to curb potential abuses. Much of this discussion concerns the plethora of potential fraud schemes and cases that have been referred to the Department of Justice, which, according to the report, include: medically unnecessary treatments; the falsification of documents; upcoding; and fraudulent cost reporting. See Id., App. II at 40-42. Like its predecessor, however, the report does not focus exclusively on the chiropractic industry, but is instead an objective examination of the various frauds and abuses against the government that stem from the healthcare industry as a whole.

The Defendants' third and final report is a June 2005 report that comes from the OIG and is titled, "Chiropractic Services in the Medicare Program: Payment Vulnerability Analysis." Def.'s Mot. for S.J., Ex. 6. The report focuses entirely on the chiropractic industry and exposes in detail how Medicare is vulnerable to significant false claims and other frauds that arise through the chiropractic industry's billing practices. It explains that of the 14.5 million claims made for chiropractic services in 2001, which resulted in $457 million in government payouts, "57 percent of these services did not meet Medicare coverage criteria (i.e. were non-covered)."

6

Id. at 8. The report went on to say that "[a]n additional 16 percent were miscoded or billed at the wrong level of spinal manipulation, and 6 percent were undocumented." Id. The report also stated that "nearly 94 percent of chiropractic services lacked some or all of the supporting documentation" that the Medicare program requires. Id. at 10. Beyond these statistics, the report outlined, in detail, the most common non-covered or miscoded services that resulted in government payouts. These included: maintenance services; services that did not involve spinal manipulation; undocumented services; services that are not medically necessary; and services coded at the wrong level (upcoding). Id. at 8-10.

To bolster the OIG report, the Defendants include a September 2005 article from "The American Chiropractor" magazine titled, "Is This the End of Medicare for Chiropractic?" See Def.'s Mot. for S.J., Ex. 11. The article acknowledges the seriousness of the OIG report and portrays it as a stern reminder of the detail that chiropractors need to include in their billing and medical documentation to avoid violating Medicare's requirements. And, while the article does not mention specifically the details of the types of frauds committed on Medicare, it draws attention to the OIG report and thereafter preaches the importance of proper documentation in the chiropractic profession.

In addition to the government reports, Defendant also attaches a December 1999 article titled, "Navigating Medicare: Getting the Bill Out," published in the Journal of the American Chiropractic Association. Def.'s Mot. for S.J., Ex. 7. There, in an uncomplicated format, the author – a chiropractic consultant – warns practitioners of the risks associated with various billing practices, such as unbundling, upcoding, overbilling Medicare and preparing false claims. Expounding on the last category, the author explains that common false claims include, among other things: billing for no-shows; billing for services that were not furnished at all; and

7

supporting claims with false records. In the end, to emphasize the article's overall theme, the author states that such practices "should be avoided at all costs." Id.

The next two articles, titled "Chiropractic Ethics in a Changing World" and "Compliance: The Cornerstone of a Healthy Practice," discuss not only the litigious dangers associated with fraudulent billing practices (i.e. upcoding and overcharging), but also the ethical considerations that physicians should keep in mind before engaging in those practices. See Id., Ex. 8, 9. Both articles mention, as examples of questionable conduct, overcharging, billing for more complex services than actually provided and waiving a patient's co-payment without informing the government.

Of the remaining articles, five of them are undated and appear on a website called "Chiropractic Economics," which apparently coincides with a printed magazine version of the publication. Id., Ex. 10, 12-14, 16. Although Defendants aver that these articles appeared on the "Chiropractic Economics" website at various times in 2005 and 2007, there is nothing on the face of the articles to corroborate the date of publication. In their current form, there is no way to determine the date on which the respective authors wrote these articles. Nevertheless, the articles range in content and, for the most part: explain how the FCA works; describe how to detect and avoid various types of healthcare frauds; note the differences between fraud and abuse; and, generally, illustrate how to stay out of trouble with licensing boards and auditors. Each of the articles discusses, in some way, the same abuses and frauds that Plaintiff alleges in her complaint – billing for services not rendered, upcoding or performing unnecessary services to generate income.

Also included are two internet articles, one of which appears on the National Health Care Anti-Fraud Association's website and the other on "Chiroecon.com," which touts itself as "The

8

Leading Chiropractic Web Site." Def.'s Mot. for S.J., Ex. 15, 17. The first is an informational source that briefly describes what health care fraud is and, among other things, how to stop and report it. The second article is titled, "Coding Questions: What are False Claims?" Id., Ex. 17. There, the author recounts a familiar list of fraudulent acts that have been prosecuted under the FCA and offers examples of the conduct in which chiropractors engage that constitutes fraud. The list includes: performing inappropriate or unnecessary medical procedures; billing for services that were not performed; running unnecessary or unrequested lab tests; using more than one billing code; double billing; upcoding and inflating bills; and forging physician signatures.

The Defendants next attach a February 2007 publication from the Illinois Chiropractic Society Journal ("ICS Journal"). The article is titled, "Fraud or Lack of Medical Necessity?" In some respects, it reads like an advertisement that justifies the need for coding and compliance experts. Def.'s Mot. for S.J., Ex. 18. The article seeks to educate chiropractors on how to properly document their procedures so that they are adequately prepared in the event of an audit. Finally, the last article also appears in the February 2007 issue of the ICS Journal and is titled "When It Comes to Insurance Billing, Don't Stand Out." Id., Ex. 19. The article summarizes the 2005 OIG report and pleads with chiropractors to "learn the criteria used to determine fraud and abuse and to learn the basis for medically necessary care and the standard of care for proper documentation." Id. The author supplements his article with many detailed examples of fraud and abuse on the government, which, of course, includes submitting bills for unnecessary services, billing for non-covered services, upcoding and waiving co-payments. The article ends with a recommendation that physicians and billing staff members become familiar with compliance criteria and invoke a compliance plan in their offices.

9

## II. DISCUSSION

### A. STANDARD OF DECISION

Summary judgment is permissible when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). When responding to such a motion the nonmoving party cannot rest on the pleadings alone, but must identify specific facts to show that a genuine and material issue of fact exists. Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003); Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000).

In deciding a motion for summary judgment, the court views the record and draws all inferences in a light most favorable to the nonmoving party. FED. R. CIV. P. 56(c); Gil v. Reed, 381 F.3d 649, 651 (7th Cir. 2002). When doing so, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence, see Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002), as conclusory allegations are insufficient. Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 892-93 (7th Cir. 2003). Summary judgment is not appropriate if the court must make a choice of inferences, for the choice of reasonable inferences from the facts is a jury function. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Spiegla v. Hull, 371 F.3d 928, 935 (7th Cir. 2004).

### B. THE PUBLIC DISCLOSURE BAR TO ACTIONS BROUGHT UNDER THE FCA

Again, Defendants contend that they are entitled to judgment as a matter of law because Plaintiff's *qui tam* action is subject to the FCA's public disclosure bar, 35 U.S.C. § 3730(e)(4)(A). The inquiry into whether a court can entertain a relator's *qui tam* action has three distinct parts. See, e.g., Fowler v. Caremark, LLC, 496 F.3d 730, 736 (7th Cir. 2007). First, the Court asks whether the allegations made by Plaintiff have been publicly disclosed. If the Court

answers this in the affirmative, then it must ask whether the lawsuit was based upon that publicly disclosed information. If it was, then the Court asks finally whether the Plaintiff is the original source of the information. Id.; Feingold, 324 F.3d at 495 (listing the court's three considerations). In sum, the Court must deny summary judgment should it find either: (1) that Plaintiff's allegations were not publicly disclosed; (2) that Plaintiff's lawsuit was not based on the publicly disclosed information; or, (3) that Plaintiff was the original source of the publicly disclosed information. The threshold inquiry in all of this is whether there has been a public disclosure. Mathews, 166 F.3d at 859. In effect, the question of whether the plaintiff is the original source is immaterial unless there has been a public disclosure. Id. (citing Wang v. FMC Corp., 975 F.2d 1412, 1416 (9th Cir. 1992)).

### *1. Public Disclosures*

Defendants maintain that the publications they've attached to their motion for summary judgment illustrate that Plaintiff's allegations have been publicly disclosed. Plaintiff contends that Defendants' argument fails because her complaint is based on her own personal knowledge and experience, not the various articles and reports attached to Defendants' motion. And, in an attempt to downplay the articles and reports attached to Defendants' motion, Plaintiff asserts that they do not reveal "industry wide" practices from which Defendants could be implicated; thus, the public disclosure bar does not apply. Plaintiff, however, is mistaken.

"A public disclosure exists under § 3730(e)(4)(A) 'when the critical elements exposing the transaction as fraudulent are placed in the public domain.'" Kennedy, 512 F. Supp. 2d at 1164 (quoting Feingold, 324 F.3d at 495). This standard does not require that the specific defendants be named or identified in the public disclosures. See Schultz v. Devry Inc., No. 07 C 5425, 2009 WL 562286, at *3 (N.D. Ill. Mar. 4, 2009) ("The specific defendants named in the

lawsuit do not need to be identified in public disclosures."). It is sufficient that the public disclosures contain information regarding industry-wide abuses that mimic closely the plaintiff's alleged fraud. United States ex rel Gear v. Emergency Med. Assocs. of Ill., Inc., 436 F.3d 726, 728-29 (7th Cir. 2006). The inquiry thus requires the Court to examine the publications attached to Defendants' memorandum to determine whether they expose the "critical elements" of Plaintiff's alleged fraud. We find that they do.

On a close review, the publications attached to Defendants' motion describe the same fraudulent billing practices and procedures that Plaintiff alleges in her amended complaint. Every report and article that Defendants attach to their motion mentions, in some way, the following practices: upcoding, billing Medicare for services not rendered, billing Medicare for covered services when non-covered services were provided, waiving co-payments and billing Medicare for and performing unnecessary chiropractic procedures. Strikingly, these are the same procedures that underlie Plaintiff's claim under the FCA.

What is more, the 2005 OIG report, which specifically discusses the chiropractic industry, sent such waves through the chiropractic community that authors wrote about its conclusions for several years. After the OIG report came out, starting in 2005, authors published a slew of articles that defined what the government perceived as "fraudulent," while warning chiropractors of their duties to comply with Medicare's requirements and offering tips on how to stay off the government's radar. Even a cursory review of the publications that Defendants offered in support of their motion illustrates this point. There is no dispute that the OIG report brought to the government's attention the fraudulent practices apparent in the chiropractic industry. Again, these practices mirror those alleged in Plaintiff's complaint. This is more than sufficient to show a public disclosure. See Mathews, 166 F.3d at 861 ("The point of public

— 

12

disclosure of a false claim against the government is to bring it to the attention of the authorities . . ."); United States ex rel. Fine v. Chevron, Inc., 72 F.3d 740, 743 (9th Cir. 1995) (finding that information from the OIG's annual report to Congress is publicly disclosed). On the evidence presented, there is no genuine issue of material fact that Plaintiff's alleged fraud was publicly disclosed, and that the Defendants', as industry participants, were implicated in that fraud. Gear, 436 F.3d at 728-29 (finding public disclosure existed where similar, industry-wide abuses were disclosed in GAO reports, OIG reports and medical news sources, despite that the specific defendants were not identified in the public records); Kennedy, 512 F. Supp. 2d at 1166 (finding public disclosure when plaintiff's allegations and facts contained in defendant's press releases overlapped).

### 2. *"Based Upon" the Public Disclosure*

The next question for this Court to decide is whether Plaintiff's *qui tam* suit is actually "based upon" the public disclosures discussed above. The majority view holds that a *qui tam* action is based upon a public disclosure when the supporting allegations are "the same as those that have been publicly disclosed . . . regardless of where the relator obtained his information." Mathews, 166 F.3d at 863 (citing as the majority view United States ex rel. John Doe v. John Doe Corp., 960 F.2d 318, 324 (2d Cir. 1992)). But the minority view, espoused by the Seventh Circuit, provides that an action is "based upon" public disclosures within the meaning of § 3730(e)(4)(A) when it "both depends essentially upon publicly disclosed information and is actually derived from such information." Feingold, 324 F.3d at 497 (citing Mathews, 166 F.3d at 864); Kennedy, 512 F. Supp. 2d at 1166 (noting that the Seventh Circuit expressly rejected the majority standard). Under the minority standard, plaintiffs can circumvent the public disclosure bar so long as they did not rely, even in part, on the public disclosures as a basis for their claims.

13

Fowler, 496 F.3d at 737 ("Information which happens to be similar or identical to publicly disclosed allegations or transactions, but which derives from some other source than the public disclosure, is not parasitic, and should not be barred by a provision meant to bar parasitic lawsuits."). Thus, to decide whether Plaintiff's claims are parasitic, we must ask whether Plaintiff's suit depends upon the publicly disclosed information; or, asked another way, "whether the lawsuit can stand without such [publicly disclosed] information." Kennedy, 512 F. Supp. 2d at 1166. The Court finds here that Plaintiff's suit could not.

Plaintiff maintains that her claims would stand, notwithstanding the public disclosures attached to Defendants' motion for summary judgment, because many of her allegations, though not all, are based on her own personal knowledge and observations. In support of this argument, Plaintiff points to various paragraphs in her amended complaint in which she alleged that she reviewed her own billing records and fee slips before Advanced Healthcare submitted them to Medicare for payment. In doing so, she found that Warden, her supervisor, had altered those records to reflect services that Plaintiff did not perform. Then, before Advanced Healthcare sent its billing statements to Medicare, Plaintiff alleges that she "photocopied the false statements and then corrected each form," thereby thwarting the Defendants' fraud. See Compl. ¶ 39. Plaintiff conveys this story in five paragraphs of the amended complaint. See id. ¶¶ 36-37, 39, 41-42. And, arguably, these five paragraphs contain unique details not identified in the publications submitted by Defendants. But, nevertheless, these five paragraphs do not establish that her personal knowledge of any alleged fraud is direct and independent of the government reports and articles that Defendants offered in support of their motion.

Again, for Plaintiff to establish her standing to prosecute this *qui tam* claim, she must show more than evidence of a meritorious fraud claim. Plaintiff must also establish that her

14

personal knowledge of the alleged fraud is both direct and independent of any public disclosures. 31 U.S.C. § 3730(e)(4)(B); Mathews, 166 F.3d at 865. Here, the allegations based on Plaintiff's personal knowledge, if taken as true, establish that she stopped the Defendants from committing a fraud on the government. But, there is nothing in the complaint, aside from Plaintiff's mere conjecture, that establishes a meritorious fraud claim, much less that the Defendants actually submitted the altered billing statements to Medicare. In other words, Plaintiff does not allege any personal knowledge that Defendants actually committed a fraud on the government. Rather, she assumes that the Defendants billed the government for an overstated amount of money because, on an unspecified number of occasions, she changed the billing slips that Defendants supposedly planned to, but perhaps did not, submit to Medicare. With these uncertainties, it becomes clear that Plaintiff has no direct and independent knowledge that any presentation – a key element for a violation of the FCA – of altered billing statements took place. Indeed, she has no direct and independent knowledge that Advanced Healthcare *knowingly* – another key element for a violation of the FCA – presented a false claim to the government. United States ex rel. Durcholz v. FKW, Inc., 189 F.3d 542, 544 (7th Cir. 1999) (holding that innocent mistakes or negligence are not actionable under the FCA). And, finally, she has no direct and independent knowledge of any payments made by the government to Advanced Healthcare, and she has no direct and independent knowledge of any overcharges to the government by Advanced Healthcare. The Defendants do not admit any wrongdoing and Plaintiff does not admit any complicity in any alleged wrongdoing.

In this way, Plaintiff failed to adduce sufficient facts to establish that she had direct and independent knowledge of the information on which her FCA claim is based. Bannon, 406 F. Supp. 2d at 922 (finding qui tam action based upon publicly disclosed information where

15

plaintiff's allegations depend, if only essentially, on publicly disclosed documents); United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 351-52 (4th Cir. 2009) ("Section 3730(2)(4)(A)'s public disclosure jurisdictional bar encompasses actions even partly based upon prior public disclosures."). Unlike those cases in which a *qui tam* action survived, here the record is void of any evidence from which the Court could find that Plaintiff obtained, through her own efforts and not through the labors of others, direct and independent knowledge of a fraud by the Defendants. On the one hand we are faced with a complaint that established only that Plaintiff found some inconsistencies in her billing statements, and that she fixed them. On the other we have a series of government reports and articles that outline the same fraudulent activities that Plaintiff alleges against Advanced Healthcare. Accordingly, any personal knowledge that Plaintiff may have had would not be enough to sustain a claim that Plaintiff's allegations are not based on public information. See Gear, 436 F.3d at 729 (holding that where no evidence exists to support the claim independent of the publicly disclosed information, the public disclosure bar prohibits plaintiff's *qui tam* suit); see also Feingold, 324 F.3d at 497 ("Because [plaintiff] points to no evidence upon which this suit depends that is not publicly disclosed, we hold that [plaintiff] has based this action on publicly disclosed documents . . . ."); Lamers, 168 F.3d at 1017 (finding that plaintiff's suit was based upon independent knowledge where plaintiff conducted full investigation of fraud, which was ultimately committed); see generally Mathews, 166 F.3d at 863-64 (affirming that "based upon" language means "based upon in any part"). Ultimately the Court finds that Plaintiff's claims are based upon the public disclosures.

### 3. *Original Source*

Plaintiff, here, is left with one final argument. Notwithstanding whether the fraud was publicly disclosed, or whether Plaintiff based her claims on that publicly disclosed information, Plaintiff can avoid the FCA's jurisdictional bar if she was the "original source" of the information. E.g., Feingold, 324 F.3d at 497 (characterizing the original source inquiry as the "final prong of analysis"). According to the statute, "original source means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Put another way, the original source is one "who would have learned of the allegation or transactions independently of the public disclosure." Mathews, 166 F.3d at 865.

As the Court stated above, Plaintiff's knowledge of any alleged fraudulent activity is incomplete. Although some parts of her story may have been independent of the trade periodicals and other public disclosures, the rest of the scheme described in her complaint is rooted in the government reports and articles that were published well before Plaintiff filed this suit. For the most part, the government reports and articles filled in the blanks of Plaintiff's story, which is significant, seeing that the alleged fraud was neither complex nor unique. Id. at 864-65 (noting that a plaintiff may be the original source, even if every piece of information is publicly disclosed, but only if the fraud is remarkably complex and "plaintiff puts it in perspective"). For several years prior to the filing of this action, authors had been warning practitioners of the 2005 OIG report and of the potential dangers involved in fraudulent practices such as upcoding, charging for services not rendered, waiving co-payments and performing unnecessary services. Following this, Plaintiff did not raise any eyebrows with the filing of her

17

suit. If anything, she was the original source of a story in which she found various inconsistencies in her billing statements, and then changed them before Advanced Healthcare could arguably submit those statements to the government. But, she was not the original source of a widespread scheme that took place over the course of several years, which involved the same fraudulent activity that was described, in detail, in the previously-published government reports and media articles. Plaintiff produces no evidence, aside from hearsay statements, conclusory allegations and her own, self-serving testimony, that would allow a reasonable fact-finder to reach the opposite conclusion. Accordingly, the Court finds that § 3730(e)(4)(A) bars her *qui tam* action in this Court.

## III. CONCLUSION

For the reasons stated above, Defendant Advanced Healthcare Associates' motion for summary judgment is granted as to Count I of Plaintiff Kelly Baltazar's amended complaint. The Court relinquishes jurisdiction over Count II, Plaintiff's state-law claim for violation of the Illinois Insurance Claims Fraud Prevention Act.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: 4/2/09